Edith B. CHASE, et al., Petitioners,

v.

DISTRICT OF COLUMBIA ALCOHOLIC
BEVERAGE CONTROL BOARD,
Respondent,

H.H. Leonards Associates, Intervenor.

No. 94–AA–184.

District of Columbia Court of Appeals.

Argued June 7, 1995.
Decided July 20, 1995.
Opinion Granting Rehearing and
Reaffirming Decision
Nov. 13, 1995.

Richard S. Stolker, Rockville, MD, for petitioners.

Charles L. Reischel, Deputy Corporation Counsel, filed a statement in lieu of brief, for respondent.

Leonard J. Henzke, Jr., on rehearing, and Marlene L. Johnson, Washington, DC, for intervenor.

Before SCHWELB and KING, Associate Judges, and KERN, Senior Judge.

SCHWELB, Associate Judge:

On December 22, 1993, following a public hearing, the District of Columbia Beverage Control Board granted the application of H.H. Leonards, Inc., trading as H.H. Leonards Associates (HHLA), for a Class CX retailer's license for a "club" at "The Mansion," a century-old four-story townhouse located at 2020 O Street, N.W., in a residential neighborhood in Washington, D.C. Petitioners, a group of neighbors and a condominium owners' association, have asked this court to set aside the Board's decision. They contend, *inter alia*, that the license application was filed less than three months after the club came into existence, in violation of D.C.Code § 25–111(a)(7)(G) (1991).[1] We agree and reverse.

## I.

HHLA was organized in August, 1990 as an unincorporated non-profit membership association. In or about 1992, petitioner Susan Menzer, a Justice Department attorney who lived in the area, became concerned because, among other things, valet parking aides at The Mansion closed off the street to her home following an event at the establishment. She also testified that, on days following such events, she would find empty glasses in her garden. She began to investigate, and learned that although alcoholic beverages were served at 2020 O Street, N.W., no liquor license had been issued to anyone at that address. Ms. Menzer complained to the Board, but she was referred to the Metropolitan Police Department because the Board lacked jurisdiction over unlicensed retailers. The police ultimately visited The Mansion and brought the complaint to the attention of HHLA.

Upon learning of the problem, the officers of HHLA voted to incorporate as a non-profit corporation and to apply for a retailer's license. On December 8, 1993, a certificate of incorporation was issued to HHLA. On January 13, 1993, H.H. Leonards, Inc., which represented itself to be "trading as" HHLA, applied to the Board for a license for a "club."

Ms. Menzer and the other petitioners filed submissions with the Board in which they opposed the application on a number of grounds. They contended, *inter alia*, that the application was invalid under D.C.Code § 25–111 because the "club" seeking a license was not established in time. The Board held extensive public hearings in June and July, 1993, with respect to HHLA's application.

On December 22, 1993, the Board issued its "Findings of Fact, Conclusions of Law, and Order." With respect to the issue addressed in this opinion, the Board held as follows:

Section 11 of the Act, D.C.Code § 25–111(a)(7)(G)(ii) (1991), provides that no Class "CX" license shall be issued for a club that has not been established for three (3) months immediately prior to applying for the license. Section 3(g) of the Act, D.C.Code § 25–103(7) (1991), defines a club as a non-profit corporation but does not specify the length of time a club must be incorporated prior to applying for the license. The legislative history of the Act evidences an intent on the part of the Congress, when adopting the requirement that clubs be in existence for at least a three (3) month period before application

1. Except as otherwise specified, all references in this opinion to Title 25 of the District of Columbia Code are to the 1991 edition.

for a license, to ensure that only bona fide clubs, as opposed to establishments existing only to serve liquor by the drink, would be licensed. 78 Congressional Record, 268–289, 695–698, 770–776.

Applicant was incorporated as a nonprofit corporation in December, 1992, less than three (3) months prior to applying for licensure. However, the Applicant's club was established as a non-profit membership organization in 1990, more than two (2) years prior to its application for licensure. The Board concludes as a matter of law that Applicant's establishment is a legitimate club, existing for purposes greater than the sale of liquor by the drink, that was established more than three (3) months prior to the date of its application for licensure.[2]

The Board ordered that a retailer's license be issued for the premises. This petition for review followed.

**II.**

In 1934, Congress enacted legislation which repealed most of the provisions of the National Prohibition Act and created a comprehensive regulatory regime for the manufacture, sale and possession of alcoholic beverages in the District of Columbia. See Act of January 24, 1934, 48 Stat. 319, now codified as D.C.Code §§ 25–101 et seq. The Act deals explicitly with the circumstances under which a private club may obtain a retailer's license, and provides that "[n]o license shall be issued for a club that has not been established for at least 3 months immediately prior to applying for the license." D.C.Code § 25–111(a)(7)(G)(ii). The Act further provides that "[t]he word 'club' means a corporation for the promotion of some common object (not including corporations organized for any commercial or business purpose, the object of which is money profit)...." D.C.Code § 25–103(7).

HHLA became a corporation on December 8, 1992, approximately five weeks (and thus less than three months) before it applied for a retailer's license. It was not a corporation three months prior to the filing of the application. A club is, by statutory definition, a corporation. Thus, according to the unambiguous terms of the statute, HHLA could not have been established as a club for three months immediately prior to applying for the license, as required by § 25–111(a)(7)(G)(ii).

■ HHLA contends, and the Board held, that a club had been in existence since 1990, when a membership association was formed, and that the statutory three-month period was therefore satisfied. HHLA obviously applied for a retailer's license, however, because without such a license, its provision of alcoholic beverages to members and guests was proscribed by law, see D.C.Code § 25–109, and subject to criminal sanctions, including fine or imprisonment, see D.C.Code § 25–132; Hicks v. District of Columbia, 234 A.2d 801, 802–03 (D.C.1967). We are of the opinion that the two years or more during which HHLA's service of alcoholic beverages was prohibited by law cannot reasonably be considered as a part of the statutory three-month waiting period.

HHLA argues, and the Board held, that according to the Act's legislative history, the waiting period was "designed to ensure that only bona fide clubs, as opposed to establishments existing only to sell liquor by the drink, would be licensed." The legislative history submitted to us by HHLA, however, consists of excerpts from the floor debate in the House of Representatives and in the Senate in January 1934. Floor debate is seldom illuminating with respect to legislative intent, for it represents the views only of one or two of several hundred legislators. See, e.g., Bath Iron Works Corp. v. Director, Office of Workers' Compensation Programs, —— U.S. ——, ——, 113 S.Ct. 692, 700, 121 L.Ed.2d 619 (1993); Aldridge v. Williams, 44

**2.** This portion of the Board's decision (like much of the Board's findings of fact and conclusions of law) was taken almost verbatim from the proposed findings submitted by counsel for HHLA. Moreover, the Board accepted HHLA's proposed findings for filing notwithstanding HHLA's failure to serve petitioners; petitioners subsequently moved for sanctions, but their motion was denied. Under these circumstances, we are inclined to accord somewhat less deference to the Board's decision than we ordinarily would. Cf. Sacks v. Rothberg, 569 A.2d 150, 153–54 (D.C. 1990). See also note 5, infra.

U.S. (3 How.) 9, 24, 11 L.Ed. 469 (1845); *Cortelyou v. United States,* 32 App.D.C. 20, 29 (1908).[3] Moreover, in 1934, the Twenty–First Amendment was still a controversial novelty, and most of the discussion which HHLA has asked us to consider relates to the pros and cons of alcohol and its prohibition.

The portion of the debate which appears to touch directly on the issue now before us occurred in the Senate on January 17, 1934. Senator Clark of Missouri, apparently an opponent of the proposed legislation, told the Senate that after the legislature of his state enacted a Sunday closing law, numerous "lid clubs" were established in order to circumvent the ban. The cost of joining these "lid clubs" was 25 cents, and, according to Senator Clark, they were "saloons as much as the saloons which had been outlawed on Sundays, although they did not carry the same title." 78 Cong.Rec. 776 (Jan. 17, 1934). Senator Reynolds, evidently a supporter of the proposed legislation, responded as follows:

> We have in this act endeavored to legislate against that, and I think we have been successful, in that we require that a club shall have been in legitimate existence for a period of at least 3 months prior to the issuance [4] of the license; so, as a result thereof, it would be impossible for a lot of clubs to spring up like mushrooms overnight.

*Id.*

■ Where the language of a statute is clear and unambiguous, we must give effect to its plain meaning, *J. Parreco & Son v. District of Columbia Rental Hous. Comm'n,* 567 A.2d 43, 45 (D.C.1989), and there is

ordinarily no occasion for resort to legislative history. *Wilbur v. United States,* 284 U.S. 231, 237, 52 S.Ct. 113, 115, 76 L.Ed. 261 (1931); *see also In re W.L.,* 603 A.2d 839, 842 (D.C.1991). Moreover, even if we were disposed to accord significant weight to floor debate—and we are not—the foregoing exchange is far too fragmentary to permit us to construe this legislation more narrowly than its unambiguous words import. Nothing in the statute limits the applicability of the three-month waiting-period to "lid club" situations. Indeed, Senator Reynolds viewed the statute as requiring that a club shall be in *"legitimate* existence" for this three-month period. An association which has dispensed alcoholic beverages during the critical period without a license to do so cannot meet this standard.

■ HHLA argues, correctly, that the scope of our review is limited, *see, e.g., Muir v. District of Columbia Alcoholic Beverage Control Bd.,* 450 A.2d 412, 413–14 (D.C.1982), and that we must defer to the agency's interpretation of the statute if it is not plainly wrong or inconsistent with the legislative purpose. *See Coumaris v. District of Columbia Alcoholic Beverage Control Bd.,* 660 A.2d 896, 899 (D.C.1995). But "[i]t is only in cases of doubt that the construction given to an act by the department charged with the duty of enforcing it becomes material." *Burnet v. Marston,* 61 App.D.C. 91, 92, 57 F.2d 611, 612 (1932) (quoting *United States v. Tanner,* 147 U.S. 661, 663, 13 S.Ct. 436, 437, 37 L.Ed. 321 (1893); *see generally Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)). "[I]f the

**3.** In *Cortelyou,* the court stated:
All that can be determined from the debates and reports is that various members had various views, and we are left to determine the meaning of this act, as we determine the meaning of other acts, from the language used therein. There is, too, a general acquiescence in the doctrine that debates in Congress are not appropriate sources of a statute passed by that body. (Citations omitted). The reason is that it is impossible to determine with certainty what construction was put upon an act by the members of a legislative body that passed it by resorting to the speeches of individual members thereof. Those who did not speak may

not have agreed with those who did; and those who spoke might differ from each other; the result being that the only proper way to construe a legislative act is from the language used in the act, and, upon occasion, by a resort to the history of the times when it was passed. 32 App.D.C. at 29 (quoting *United States v. Trans–Missouri Freight Ass'n,* 166 U.S. 290, 318, 17 S.Ct. 540, 550, 41 L.Ed. 1007 (1897)).

**4.** Senator Reynolds apparently misspoke, for the Act requires the club to be in existence for three months prior to the *application for* the license, rather than three months before its issuance.

language of the statute involved is clear, we do not defer to the agency's interpretation." *Bates v. District of Columbia Bd. of Elections & Ethics,* 625 A.2d 891, 893 (D.C.1993). In the present case, Congress has unambiguously stated that a club must be a corporation, and we discern no ambiguity which would warrant deference to the Board's construction.[5]

The result in this case may appear somewhat harsh. The Board's order granting HHLA's application for a retailer's license was issued on December 22, 1993, almost a year after the application was filed. If § 25–111(a)(7)(G)(ii) required only that the club be in existence at least three months prior to the *issuance* of the license (as Senator Reyn-

olds apparently believed it did) then the statutory requirements would easily have been met. "It is not within the judicial function, however, to rewrite the statute, or to supply omissions in it, in order to make it 'more fair'...." *1841 Columbia Road Tenants Ass'n v. District of Columbia Rental Hous. Comm'n,* 575 A.2d 306, 308 (D.C.1990). In the words of Justice Brandeis, written for a unanimous Supreme Court,

> [t]he statute was evidently drawn with care. Its language is plain and unambiguous. What [HHLA] asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the judicial function.

5. *There are other reasons, grounded in the circumstances of this particular case, for subjecting the Board's decision to more exacting scrutiny. First, as we have noted, the Board largely adopted HHLA's proposed findings after accepting them for filing notwithstanding HHLA's failure to serve its adversary. Second, the Board did not acknowledge, in its treatment of the issue before us, that its construction of the statute was contrary to the statutory definition of a club. Third, in deciding in HHLA's favor a very difficult question which, in light of our disposition, we do not reach—namely, whether the "club" for which the license was located contained a "restaurant" as required by D.C.Code § 25–116(a)—the Board failed to acknowledge or address the tension between its construction and the statutory definition of a restaurant as a place at which the sale of food accounts for at least 45% of its gross annual receipts. See D.C.Code § 25–103(14).*

*Even more troubling was the Board's handling of petitioners' attempt to exercise the right to neighborhood veto in accordance with Section 14(e) of the Act, D.C.Code § 25–115(e). See generally Coumaris, supra, 660 A.2d at 900; Gerber v. District of Columbia Alcoholic Beverage Control Bd., 499 A.2d 1193, 1197 (D.C.1985). Five objectors filed protest petitions through their designated representative, Jerrold L. Kluger, see 35 DCMR § 1607.5, but they did not personally carry the petitions to the Board's office. The petitions were accepted by the Board's staff, together with Kluger's representation letter. Kluger testified that he inquired, both at the time of filing and by telephone the following day, as to whether there were any problems with the protest petitions. He was told that there were none. Subsequently, the Board rejected the petitions on account of the objectors' failure to comply with 35 DCMR § 1703.6, which states that "[a]ny eligible objector may initiate the petition process*

*by delivering to the Board in person a petition proposal." (Emphasis added). In response to Kluger's argument that he was misled by the Board's staff, one of the members of the Board remarked sardonically that "[o]ur staff can't practice law."*

*We recently had occasion to comment on the Board's obligation to assess Section 14(e) petitions with due regard to "the importance of preserving inviolate the citizen's right to vote." Coumaris, supra, slip op. at 10 (citations omitted). In light of this consideration, we question the legality of the Board's purported requirement of "in person" service, which is nowhere to be found in the statute. See D.C.Code § 25–115(e)(3). Moreover, even if we were to assume the validity of this requirement, petitioners plausibly argued that the Board had an obligation to waive it here on equitable grounds, because Kluger had apparently been "affirmatively misled" by the Board's staff. See, e.g., Ouriaghli v. Moore, 621 A.2d 392, 394 (D.C.1993).*

*As it turned out, however, the neighborhood veto provisions were not applicable to this case at all. As HHLA correctly pointed out in its brief in this court, Section 14(e) unambiguously states that "the provisions of this subsection (e) shall not apply to applications ... for a retailer's license, class C/X for a club." Neither the Board nor any of the parties detected this problem during the proceeding before the agency. The Board's dismissal of the section 14(e) petitions on questionable grounds was thus based on a misapprehension as to the applicability to these facts of the concededly complex statute which the Board is charged with enforcing.*

*The judiciary is the final authority on issues of statutory construction. Chevron, U.S.A., supra, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9. Although it is sometimes appropriate to defer to agency expertise, id. at 844, 104 S.Ct. at 2782, we conclude that this is not such a case.*

*Iselin v. United States,* 270 U.S. 245, 250–51, 46 S.Ct. 248, 250, 70 L.Ed. 566 (1926).[6]

### III.

For the foregoing reasons, the Board's decision is reversed, and the case is remanded to the Board with directions to deny HHLA's application for a retailer's license and to revoke the license previously issued.

*So ordered.*

### ON PETITION FOR REHEARING

In *Chase v. District of Columbia Alcoholic Beverage Control Bd.,* No. 94–AA–184 (D.C. July 20, 1995) (*Chase I* ), this court held that the Board erred in granting intervenor H.H. Leonards Associates (HHLA) a Class CX retailer's license. We concluded that HHLA was not entitled to the license because it had not been incorporated for three months immediately prior to the date of its application, and that it therefore had not been a club for the period required by D.C.Code § 25–111(a)(7)(G)(ii) (1991).[1] We reversed the Board's decision and remanded the case to the Board with directions to revoke the license previously issued and to deny HHLA's application.

HHLA has filed a timely petition for rehearing in which it does not contest the court's construction of the statutory three-month requirement, but argues that the relief which the court ordered the Board to grant was overbroad. HHLA points out that the moratorium on issuance of new Class CX licenses in the geographic area where HHLA's purported club was located, *see Chase I,* at 1269 n. 6, did not become effective until July 22, 1994, seven months after the Board's order in this case. Accordingly, says HHLA, if the Board had construed the statute correctly, then HHLA could have filed a timely application which would not have been barred by the moratorium. HHLA claims that it relied, to its detriment, on the Board's ruling that it could apply for a license without having been incorporated for 90 days at the time of its application.

The gravamen of HHLA's position is that it was "lulled" by the Board's erroneous construction of the statute into not filing a new, valid and timely application at some time three months after it had been incorporated but before the moratorium became effective. HHLA points out that, by the time this court set aside the Board's ruling and eliminated the basis for HHLA's reliance on the Board, it was too late to file the application. Accordingly, says HHLA, equitable considerations should preclude the relief ordered by the court.

■ The "lulling" or "unique circumstances" doctrine was "designed to create a very narrow equitable exception to rigorous filing requirements." *See, e.g., Frain v. District of Columbia,* 572 A.2d 447, 451 (D.C. 1990). In order to invoke the doctrine, HHLA must show that its reliance on the erroneous action of the Board was reasonable. *Id.; see also Ouriaghli v. Moore,* 621 A.2d 392, 395 (D.C.1993); *cf. Harris Truck Lines, Inc. v. Cherry Meat Packers, Inc.,* 371 U.S. 215, 216–17, 83 S.Ct. 283, 284–85, 9 L.Ed.2d 261 (1962) (per curiam).

■ In the present case, as we noted in *Chase I,* HHLA's claim that it had been a

---

6. There are circumstances in this case which arguably temper any hypothetical unfairness in the enforcement of the statute according to its terms. On June 16, 1993, shortly before the Board's hearings in this case, the Board unanimously approved a five year moratorium on, *inter alia,* the issuance of any new Class C/X licenses in the area. The reasons given for the moratorium were very similar to some of the substantive arguments made by petitioners, and by an Advisory Neighborhood Commission, in opposition to HHLA's application, including in particular the over-concentration of licensed establishments in the area and their adverse effects on peace and order. The moratorium was approved by the Council of the District of Columbia

and published in the District of Columbia Register on December 3, 1993, less than two weeks before the Board's decision. *See* 40 D.C.Reg. 8388 (1993). Although the moratorium did not by its terms apply to HHLA's application, its promulgation has some relevance to the equities of this controversy.

We also note that on May 24, 1994, D.C.Code § 25–116 was amended so as to preclude the issuance of retailer's licenses to clubs in residential areas. *See id.* Supp.1995; D.C.Law 10–122, § 2(g); 41 D.C.Reg. 1658 (1994).

1. Under the applicable statute, a club must be a not-for-profit corporation. D.C.Code § 25–103(7) (1991); *Chase I, supra,* at 1265.

club for three months at the time it filed its application could not be reconciled with the unambiguous statutory requirement that a club be a corporation. *See* D.C.Code § 25–103(7) (1991). We do not believe that HHLA could reasonably rely on a notion that an unambiguous statute does not mean what it says. Moreover, even if, solely for the sake of argument, we were to indulge the dubious assumption that HHLA and its counsel were unaware of the dispositive statute on January 13, 1993, when the application for a license was filed, and that such lack of awareness was sufficiently reasonable to warrant invocation of the lulling doctrine, all parties concerned were surely made aware of the problem in June 1993, when petitioners invoked the statute and asked the Board to dismiss HHLA's application. Petitioners' motion put HHLA on notice that its unorthodox interpretation of the statutory language was now being challenged, and they were surely apprised of the possibility that this interpretation might not withstand rigorous scrutiny.

Upon the filing of petitioners' motion, HHLA had a choice. It could elect to file a new application for a license, which would be in compliance with the statute, for at the time petitioners filed their motion, HHLA had been incorporated for half a year, a substantially longer period than the statute required. Alternatively, HHLA could rely on its original application, which had been filed less than three-months after HHLA's incorporation, and gamble on the possibility that the non-literal construction would prevail.

HHLA chose the second, and plainly riskier, course. It then persuaded the Board to adopt an interpretation of the statute which, as we held in *Chase I*, was contrary to its unambiguous language. On rehearing, HHLA does not assert that the statute is ambiguous or that this court has misconstrued it. We conclude that HHLA has failed to demonstrate that its reliance on the Board's decision was reasonable.

▮ Moreover, the "unique circumstance" doctrine may be successfully invoked only upon a showing of affirmative statements or actions on the part of the tribunal which have misled the party claiming to have been lulled. *Frain, supra,* 572 A.2d at 451–52. A ruling in HHLA's case, made at HHLA's behest and contrary to the statutory language, does not constitute the kind of misleading affirmative representation on which HHLA may successfully claim to have reasonably relied. *See id.* at 451 ("we question whether the court's mere acquiescence in a request by the movant would be sufficient").[2]

▮ HHLA contends, in the alternative, that the court should apply its interpretation of the statute "on a prospective rather than a retroactive basis." It relies on *French v. District of Columbia Bd. of Zoning Adjustment,* 658 A.2d 1023 (D.C.1995), and *Mendes v. Johnson,* 389 A.2d 781 (D.C.1978) (en banc). We stated in *Mendes* and reiterated in *French* that

> [w]here retroactive application of a new rule would result in substantial disruption of settled transactions and/or injustice to a party because of reliance on the continued validity of the prior legal rule—especially one of long standing—courts are extremely reluctant to accord retroactive effect to overruling decisions.

*Mendes, supra,* 389 A.2d at 789, *quoted in French, supra,* 658 A.2d at 1031.

In *Mendes,* however, the doctrine which the en banc court overruled had been in effect for many decades, and reliance on it was both reasonable and widespread. Similarly, in *French,* the prevailing parties had acted in reliance upon an opinion of the Corporation Counsel which had been issued in 1977 and which had never previously been challenged in court. In the present case, on the other hand, HHLA has not shown or alleged that it relied on a long-standing legal doctrine which was suddenly or surprisingly abandoned by the court. Indeed, the only precedent cited by HHLA is the Board's erroneous ruling in the present case. That ruling, as we have noted, was secured by HHLA itself. We do not believe that the

---

2. Indeed, one might reasonably ask whether, in this case, HHLA was the lullor or the lullee. *See*      *Frain, supra,* 572 A.2d at 451–52.

principles set forth in *Mendes* and *French* have any application to circumstances such as those presented here.[3]

We recognize that the result we reach may be a harsh one *vis-a-vis* HHLA. It might arguably have been more reasonable for Congress to require a club to have been incorporated for three months at the time it received its license, rather than at the time the club applied for one. The statute, however, does not so provide, and this court is without authority to substitute its subjective perceptions of fairness and justice for the requirements of the law. *See, e.g., Ayers v. Landow,* 666 A.2d 51, 57 (D.C.1995).

For the foregoing reasons, the petition for rehearing is granted. The decision in *Chase I* is reaffirmed.

*So ordered.*

---

**3.** *England v. Louisiana State Bd. of Med. Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), on which HHLA also relies, does not support its position. In *England,* the Supreme Court declined to apply a newly-announced rule to the litigants before it when those litigants had relied on an interpretation of a prior Supreme Court decision which was supported by "respectable authorities, including the court below." *Id.* at 422 & n. 14, 84 S.Ct. at 468 & n. 14.